UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

FORREST V. LADUKE, JR.,

                 Plaintiff,                Case No. 6:12-cv-00058-ST

       v.                          **OPINION AND ORDER**

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,[1]

                 Defendant.

**STEWART, Magistrate Judge:**

## <u>INTRODUCTION</u>

      Plaintiff, Forrest V. LaDuke, Jr., ("LaDuke"), seeks judicial review of a final decision by

the Social Security Commissioner ("Commissioner") denying his applications for Disability

Insurance Benefits ("DIB") under Title II and Supplemental Security Income ("SSI") under

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to FRCP 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 USC § 405(g).

Title XVI of the Social Security Act ("SSA") , 42 USC §§ 401–33.  This Court has jurisdiction

pursuant to 42 USC § 405(g).  All parties have consented to allow a Magistrate Judge to enter

final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).  For

the reasons set forth below, the Commissioner's decision is affirmed.

## <u>ADMINISTRATIVE HISTORY</u>

LaDuke protectively filed for DIB and SSI in January 2008, alleging a disability onset

date of September 30, 2004.  Tr. 144–51.[2]  After his applications were denied both initially and

on reconsideration, LaDuke requested a hearing before an Administrative Law Judge ("ALJ").

Tr. 93–10, 114–15.  On August 12, 2010, ALJ Rudolph Murgo held a hearing at which LaDuke

was represented and testified, as did his wife, Jamaica LaDuke, and a Vocational Expert ("VE"),

Mark McGowan.  Tr. 33–88.  During the hearing, LaDuke amended his onset date to August 30,

2006.  Tr. 36.  On September 2, 2010, the ALJ issued a decision finding LaDuke not disabled

within the meaning of the Act.  Tr. 13–22.  On November 16, 2011, the Appeals Council

accepted LaDuke's proffer of new evidence, but denied his request for review, making ALJ

Murgo's decision the final decision of the Commissioner.  Tr. 1–6; 20 CFR §§ 404.981,

416.1481.

## <u>BACKGROUND</u>

LaDuke was born in 1971.  Tr. 38.  He completed school through the eighth grade and

never obtained his GED.  Tr. 40.  He has past relevant work as an industrial maintenance repair

helper, an automobile service station attendant, and a ranch hand.  Tr. 76–77.  LaDuke alleges

that he became unable to work on August 30, 2006, due the combined effect of his impairments,

---

[2] Citations are to the page(s) indicated in the official transcript of record filed on June 25, 2012 (docket #12).

including back injury, right foot and ankle injury, numb legs, and swelling of the knee.  Tr. 36, 168.

## DISABILITY ANALYSIS

In construing an initial disability determination, the Commissioner engages in a sequential process encompassing between one and five steps.  20 CFR §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 US 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.  20 CFR §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12–month durational requirement.  20 CFR §§ 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); 20 CFR Pt. 404, Subpt P, App 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").  The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.  20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96–8p, *available at* 1996 WL 374184.

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.  20 CFR §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.  *Yuckert*, 482 US at 142; *Tackett v. Apfel*, 180 F3d 1094, 1099 (9th Cir 1999); 20 CFR §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

The initial burden of establishing disability rests upon the claimant.  *Tackett*, 180 F3d at 1098.  If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC.  *Id.*  If the Commissioner meets this burden, then the claimant is not disabled.  20 CFR §§ 404.1566, 416.966.

## ALJ'S FINDINGS

At step one, the ALJ found that LaDuke has not engaged in any substantial gainful activity since the amended alleged onset date of his disability, August 30, 2006.  Tr. 15.  At step two, the ALJ determined that LaDuke suffers from the severe impairments of osteoarthritis of the right ankle and left knee, mild degenerative joint disease of the lumbar spine, obesity, bipolar disorder, and alcohol dependence (in sustained full remission).  *Id.*  At step three, the ALJ found that LaDuke's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment.  Tr. 16–17.

Because LaDuke did not establish disability at step three, the ALJ continued to evaluate how his impairments affected his ability to work.  The ALJ concluded that LaDuke had the RFC to:

> perform a range of sedentary work . . . except due to chronic knee and
> ankle pain attributable degenerative arthritis and aggravated by obesity, he
> can perform tasks that involve no more than 6 hours of sitting, or more
> than 4 hours of standing/walking in an 8-hour workday.  Such tasks must

OPINION AND ORDER, Page 4

> avoid use of right foot controls and must allow for use of an assistive device when walking long distances or [over] uneven terrain (though not for each step). He must avoid balancing, stooping, kneeling, crouching, crawling, or climbing. Due to the claimant's mental symptoms, such tasks must involve simple instructions of 1–2 steps and be broken down into tasks sequences.

Tr. 17.

At step four, the ALJ found that LaDuke was unable to perform his past relevant work. Tr. 20. At step five, the ALJ found that LaDuke was capable of performing jobs that exist in significant numbers in the national economy. Tr. 21–22. Accordingly, the ALJ concluded that LaDuke was not disabled at any time between August 30, 2006, and the date of his decision, September 2, 2010. Tr. 22.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on the proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004). The court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Id*, citing *Robbins v. Soc. Sec. Admin.*, 466 F3d 880, 882 (9th Cir 2006); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Lingenfelter*, 504 F3d at 1035; *Batson*, 359 F3d at 1193.

///

///

OPINION AND ORDER, Page 5

## DISCUSSION

LaDuke argues that the ALJ erred by:  (1) not determining that his pain disorder was severe at step two; (2) improperly assessing his subjective symptom testimony; (3) improperly assessing the medical evidence; (4) improperly rejecting the lay witness's testimony; and (5) relying on the testimony of a VE that was premised on a legally deficient hypothetical.

## I.    Step Two Findings

LaDuke first argues that the ALJ failed to include his pain disorder as a severe impairment at step two.  At step two, the ALJ determines whether the claimant has a medically determinable severe impairment or combination of impairments.  20 CFR §§ 404.1520, 416.920.  An impairment is "not severe" if it does not significantly limit a claimant's ability to do basic work activities.  20 CFR §§ 416.921, 404.1521; *see also Webb v. Barnhart*, 433 F3d 683, 686 (9th Cir 2005).  The step two threshold is low and is described by the Ninth Circuit as a "*de minimus* screening device to dispose of groundless claims."  *Smolen v. Chater*, 80 F3d 1273, 1290 (9th Cir 1996).

On February 10, 2009, Paula M. Belcher, Ph.D., performed a psychological assessment of LaDuke.  Tr. 326–31.  Based on the results of a mental status examination and a diagnostic interview, Dr. Belcher diagnosed LaDuke with "Pain Disorder Associated With Both Psychological Factors and a General Medical Condition,"[3] as well as with a moderate, recurrent

---

[3] "The essential feature of Pain Disorder is pain that is the predominant focus of the clinical presentation and is of sufficient severity to warrant clinical attention."  American Psychiatric Ass'n Diagnostic & Statistical Manual of Mental Disorders 498 (4th ed. 2000, text revision) ("*DSM-IV*").  Pain disorder is characterized by evidence of psychological factors that play "an important role in the onset, severity, exacerbation, or maintenance of . . . pain."  *Id* at 503.  In essence, a patient with a pain disorder may present with physical symptoms indicative of pain which are exacerbated by the psychological disorder.  *See id* at 498–99; *see also The Merck Manual of Diagnosis and Therapy* 1577 (Robert S. Porter et al. eds., 19th ed. 2011) ("*Merck Manual*") (diagnosis made "after excluding a physical disorder that would adequately explain the pain and its onset").  As such, a patient with a pain disorder may indeed suffer from more pain than would be expected from a given injury.  *Merck Manual* at 1577.

major depressive disorder, alcohol dependence in sustained full remission, and nicotine

dependence.  Tr. 331.  Although the ALJ did not list the diagnosis of a pain disorder as a severe

impairment at step two, he did not commit reversible error.

First, Dr. Belcher noted that despite LaDuke's reports of "intense and constant pain, he

also "was able to maneuver a flight of stairs alone and sat for an hour and a half without apparent

physical distress."  *Id.*  In other words, LaDuke's pain disorder did not severely limit his

mobility.  Second, the ALJ found that LaDuke suffered from the severe impairments of

osteoarthritis of the right ankle and left knee, mild degenerative joint disease, and obesity.

Tr. 15.  Nothing in the record suggests that limitations secondary to a pain disorder were not

already captured by these other severe impairments, particularly osteoarthritis and degenerative

disk disease.

In any event, any error in designating specific impairments as severe did not prejudice

LaDuke because the ALJ resolved step two in his favor.  *Gray v. Comm'r Soc. Sec. Admin.*, 365

Fed App'x 60, 61 (9th Cir 2010) (rejecting argument that the ALJ erred at step two by

determining certain impairments were nonsevere because "the ALJ concluded that [claimant's]

other medical problems were severe impairments"); *Mondragon v. Astrue*, 364 Fed App'x 346,

348 (9th Cir 2010) ("Any alleged error at step two was harmless because step two was decided in

[claimant]'s favor with regard to other ailments.").  Therefore, the ALJ did not commit any

reversible error at step two.

## II.    Plaintiff's Credibility

LaDuke also argues that the ALJ failed to provide a clear and convincing reason for

rejecting his subjective symptom testimony regarding the extent of his impairments.  When a

OPINION AND ORDER, Page 7

claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F3d at 1281 (citation omitted).

A general assertion that a claimant is not credible is insufficient; the ALJ "must state which [subjective symptom] testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F3d 915, 918 (9th Cir 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F3d 748, 750 (9th Cir 1995) (citation omitted). If, however, the "ALJ's credibility finding is supported by substantial evidence in the record, we may not engage in second-guessing." *Thomas v. Barnhart*, 278 F3d 947, 959 (9th Cir 2002) (citation omitted).

LaDuke identifies chronic pain, depression, and anxiety as his primary debilitating conditions. *See, e.g.*, Tr. 189, 191, 195-96. LaDuke's chronic pain is a result of injuries to his right ankle and left leg. Tr. 190, 196–97. As a result of these injuries, LaDuke must intermittently rest while performing most activities. Tr. 191, 194. The pain in LaDuke's legs and back limits his ability to walk any distance and requires him to leave work periodically to return home to rest. Tr. 48, 58, 62. Furthermore, as he tires, LaDuke reports that he gets upset, resulting in an anxiety attack. Tr. 191. He also describes himself as easily irritated with difficulty controlling his anger. Tr. 59.

The ALJ determined that LaDuke's "medically determinable impairments could reasonably be expected to [have] cause[d] the alleged symptoms; however, [his] statements regarding the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the" RFC.  Tr. 18.  The ALJ offered several reasons for discounting LaDuke's testimony, including his activities of daily living, tendency to exaggerate his symptoms, and work history.  Tr. 18–20.

First, the ALJ noted LaDuke's "demonstrated ability to perform a variety of household chores and daily activities."  Tr. 19–20.  Daily activities can form the basis of an adverse credibility finding where they either contradict a claimant's other testimony or meet the threshold for transferable work skills.  *See Orn v. Astrue*, 495 F3d 625, 639 (9th Cir 2007).  A claimant, however, need not be utterly incapacitated to receive disability benefits, and sporadic completion of minimal activities is insufficient to support a negative credibility finding. *Vertigan v. Halter*, 260 F3d 1044, 1050 (9th Cir 2001); *see also Reddick*, 157 F3d at 722–23 (requiring the level of activity to be inconsistent with the claimant's claimed limitations to be relevant to his or her credibility).

In support, the ALJ cited LaDuke's report that "he had been cutting wood for several days."  Tr. 19.  On November 29, 2006, LaDuke reported cutting wood for three days which left him with "body aches and muscle pain."  Tr. 273.  At a follow-up visit on December 7, 2006, Paul Fieber, a physician assistant, reviewed an x-ray of LaDuke's lumbar spine, found "some slight spondylosis only with slight osteophytes," and recommended that LaDuke "continue with exercises, stretching, and ibuprofen."  Tr. 271.

OPINION AND ORDER, Page 9

LaDuke argues that the back pain he experienced after cutting wood is evidence that he is not actually capable of performing such vigorous work without incurring more limitations. This argument is unavailing.  As early as May 30, 2006, LaDuke complained of back pain during an examination by Jason Wilks, D.P.M.  Tr. 260.  And in a functional report submitted in 2008, LaDuke noted that he broke his lower back "4 or 5 years ago" after his vehicle "went off a cliff." Tr. 196.  As such, it was not unreasonable for the ALJ to conclude that the wood cutting was not the source of LaDuke's alleged back pain, but instead that LaDuke was able to perform that activity despite his back pain.  *See Orn*, 495 F.3d at 639 (permitting an adverse credibility based on daily activities contradicting the claimants other testimony).  The Court must defer to an ALJ's reasonable interpretation of the evidence, even if it is not the only possible interpretation. *Rollins v. Massanari*, 261 F3d 853, 857 (9th Cir 2001).

Standing alone, the wood cutting would not be substantial evidence justifying an adverse credibility finding, but the ALJ gave additional reasons.  The ALJ also noted LaDuke's part-time employment as a co-manager of the mobile home park where he resides.  Tr. 20.  At the time of the hearing, LaDuke worked alongside his wife, supervised two employees and performed some maintenance work.  *See* Tr. 42–44.  He testified that he has no trouble interacting with his supervisor or the two employees he supervises.  Tr. 54–55.  He also described working around four hours in the morning, leaving by noon to return to bed.  Tr. 57–58, 62.

LaDuke argues that the ALJ ignored his need to leave his job periodically to alleviate his pain.  Although LaDuke characterized his position as shared with his wife, their wages are paid separately and they have similar, but not identical, duties.  Tr. 42–43, 67.  LaDuke reported to Carol Crocker, FNP, that "[h]e is physically active on his job daily," but also suffered "a lot of

pain when he gets up in the morning and at the end of the workday." Tr. 410.  Further, as

discussed below, despite LaDuke's testimony regarding his need to rest after working in the

morning, he also testified to also occasionally performing chores.  *See, e.g.*, Tr. 55–56, 189.

Because of LaDuke's equivocations about his level of activity at and after work, the ALJ's

interpretation of the evidence may not be the only reasonable one.  *See Fair v. Bowen*, 885 F2d

597, 604 (9th Cir 1989) (affirming an adverse credibility finding despite the claimant's testimony

"that he is unable to walk more than the shortest distances[ and] suffers from pain-induced

fatigue that frequently forces him to stop what he is doing and lie down").  However, it is not the

Court's role to second-guess it.  *See Rollins*, 261 F3d at 857, citing *Fair*, 885 F2d at 604.  As

such, the ALJ properly relied on evidence of LaDuke's part-time work after the alleged disability

date.  *See Greger v. Barnhart*, 464 F3d 968, 972 (9th Cir 2006) (holding evidence of limited work

during the operative period is relevant to a claimant's credibility).

The ALJ noted that in addition to part-time work, LaDuke has a "demonstrated ability to

perform a variety of household chores and daily activities."  Tr. 20.  The ALJ found that LaDuke

requires assistance entering and exiting his shower, but otherwise can care for himself.  Tr. 16;

*see also* Tr. 55–56, 189.  The ALJ also found that LaDuke "is able to prepare simple meals and

perform light household chores such as washing dishes and laundry . . . , goes outside daily,

drives a vehicle, goes shopping in stores, and helps his children with their homework."  Tr. 16.

LaDuke argues that the ALJ mischaracterized his daily activities, finding them more

demanding than actually performed.  LaDuke is correct.  The daily activities cited by the ALJ,

standing alone, would be unlikely to support a negative credibility finding.  *See, e.g.*, *Vertigan*,

260 F3d at 1050 ("One does not need to be 'utterly incapacitated' in order to be disabled."),

OPINION AND ORDER, Page 11

quoting *Fair*, 885 F2d at 603.  However, LaDuke's daily activities must be considered in concert with his testimony that he works up to four hours per day.  The ALJ's reliance on daily activities that LaDuke performs, in addition to his part-time work, further supports his conclusion that LaDuke is not as disabled as alleged.  *See Molina*, 674 F3d at 1113 ("Even where [daily] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.") (citations omitted).

Finally, the ALJ noted that Dr. Belcher, in reference to LaDuke's reports of intense and constant pain, found that LaDuke made "exaggerated statements" and that the medical evidence she reviewed contained no "mention of the other serious injuries he stated he had incurred." Tr. 328, 330.  Dr. Belcher also noted that despite LaDuke's reported impairments, "he was able to maneuver a flight of stairs alone and [sit] for an hour and a half without apparent physical distress."  *Id.*  An ALJ may utilize "ordinary techniques of credibility evaluation" which includes "the claimant's reputation for lying . . . and other testimony by the claimant that appears less than candid."  *Smolen*, 80 F.3d at 1284.  As such, the ALJ properly considered Dr. Belcher's opinion of LaDuke's tendency to exaggerate his symptoms.

In sum, the reasons given by the ALJ are clear and convincing and supported by substantial evidence.  Thus, the ALJ's negative credibility finding is affirmed.

## III.    **Medical Evidence**

LaDuke also argues that the ALJ erred in his consideration of the opinions of both Dr. Belcher, an examining psychologist, and Kenneth Roders, a therapist intern.  Social security cases involve three types of medical opinions, namely those from treating, examining, and non-

examining doctors.  *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  To reject the

uncontroverted opinion of a treating or examining doctor, the ALJ must present clear and

convincing reasons for doing so.  *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005), citing

*Lester*, 81 F3d at 830–31. However, if a treating or examining doctor's opinion is contradicted

by another doctor's opinion, it may be rejected by specific and legitimate reasons.  *Id.*

### A.    Dr. Belcher

The ALJ considered Dr. Belcher's findings, but he did not expressly adopt her report.

Tr. 19.  Noting that Dr. Belcher "offers no functional assessment," the ALJ instead gave "great

weight" to the assessment of Joshua J. Boyd, Psy.D., who reviewed and incorporated

Dr. Belcher's findings into his opinion.  Tr. 345-57 (Psychiatric Review Technique form).

LaDuke asserts that the ALJ erroneously disregarded Dr. Belcher's diagnosis of pain disorder

and depression.  Tr. 331.

At step two, the ALJ found bipolar disorder to be LaDuke's only severe mental

impairment.  Tr. 15.  Additionally, when discussing Dr. Belcher's report, the ALJ did not

mention either diagnosis, but did note that Dr. Belcher's report "offers no functional

assessment." Tr. 19.  However, the ALJ explained that Dr. Boyd "considered Dr. Belcher's

findings in concluding that the claimant is capable of understanding, remembering, and carrying

out short instructions of 1-2 steps that are broken down into simple task sequences." Tr. 19,

citing Tr. 357, 368.  The ALJ accorded "great weight" to Dr. Boyd's opinion, in part because it

was consistent with "Dr. Belcher's previously reported findings." Tr. 19.

LaDuke does not challenge the ALJ's treatment of Dr. Boyd's opinion or the ALJ's

finding that Dr. Belcher did not offer a functional assessment.  In her report, Dr. Belcher noted

her observations of LaDuke during the examination and recorded his own subjective narrative.

Tr. 329–31.  Her report mentions only that LaDuke "may have some mild impairment in

attention, concentration, and memory," which is the basis for Dr. Boyd's mental RFC.  Tr. 327,

357, 368.  Otherwise, Dr. Belcher's discussion of LaDuke's depression is limited to a recitation

of his reported symptoms, and her discussion of LaDuke's pain disorder is similarly limited.

Tr. 331–32.  In contrast, Dr. Boyd's mental RFC finding translates the entirety of Dr. Belcher's

report into concrete functional limitations.

   The ALJ adopted Dr. Boyd's mental RFC finding and incorporated it into LaDuke's RFC

and the hypothetical questions to the VE.  Tr. 17, 78.  There is no evidence, however, that the

ALJ adopted Dr. Belcher's diagnoses of pain disorder and major depressive disorder which

Dr. Boyd also endorsed.  Tr. 348, 351.  An ALJ, however, is not required "to discuss every piece

of evidence."  *Howard ex rel. Wolff v. Barnhart*, 341 F3d 1006, 1012 (9th Cir 2003) (quotations

omitted).  If the evidence is "neither significant nor probative," an ALJ does not err in failing to

discuss it.  *See id* (citation omitted).  Here, the ALJ's acceptance of Dr. Boyd's mental RFC,

which incorporated Dr. Belcher's report, obviated the ALJ's need to discuss the specific

diagnoses relied on by Dr. Boyd.  Significantly, Dr. Belcher's singular reference to pain disorder

is unaccompanied by any description of its effect on LaDuke beyond his self-reported pain

symptoms.  The functional limitations derived from LaDuke's pain symptoms are accounted for

by the physical examination of LaDuke on February 12, 2009, by DeWayde C. Perry, M.D.

(Tr. 334) which the ALJ found consistent with Dr. Belcher's report and gave great weight.

Tr. 19.  In March 2009, Sharon B. Eder, M.D. reviewed all of the medical evidence, including

the reports by Drs. Belcher and Perry, before completing her Physical Residual Functional

OPINION AND ORDER, Page 14

Capacity Assessment.  Tr. 358-65.  Because the ALJ derived the physical RFC from Dr. Perry's opinion and the mental RFC from Dr. Belcher's report, which amount for the sum of LaDuke's functional limitations, the ALJ did not err in failing to discuss the diagnoses of pain disorder and major depressive disorder.

Even if the Court assumes the ALJ erred by failing to mention Dr. Belcher's diagnoses, the "ALJ's decision remains legally valid, despite" the error.  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F3d 1155, 1162 (9th Cir 2008); *see also Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Robbins*, 466 F3d at 885 ("[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'").  An ALJ must include all limitations supported by substantial evidence in the RFC and any subsequent VE hypothetical.  *See Bayliss*, 427 F3d at 1217–18, citing *Magallanes v. Bowen*, 881 F2d 747, 756–57 (9th Cir 1989).  The Commissioner argues the error is harmless because LaDuke cites no evidence of functional limitations stemming from either pain disorder or major depressive disorder diagnosed by Dr. Belcher that the ALJ failed to include in the RFC.

Dr. Belcher's psychological examination of LaDuke was comprised of two components, a mental status exam and a diagnostic interview.  Tr. 326.  From the results of the mental status examination, Dr. Belcher concluded that LaDuke "may have some mild impairment in attention, concentration, and memory."[4]  Tr. 326–27.  Dr. Belcher noted that the diagnostic interview was

---

[4]  Although the ALJ found that Dr. Belcher reported no functional limitations, Dr. Belcher's equivocal statement regarding LaDuke's attention, memory, and concentration could be interpreted as one.  Tr. 327.  However, the ALJ relied heavily on Dr. Boyd who found that LaDuke suffered a moderate limitation in concentration, persistence, and pace.  Tr. 355.  As such, if the ALJ erred in finding Dr. Belcher's report contained no functional limitations, then the error was harmless because the ALJ ultimately relied on a more restrictive opinion.  *See Tommasetti*, 533 F3d at 1038 (holding an error harmless if it is inconsequential to the ultimate nondisability determination).

"based solely on the client's self-report and one medical record." Tr. 327.  In her conclusion,
Dr. Belcher noted that the diagnostic interview and mental status examination "suggest the
following hypotheses" which summarize LaDuke's self-reported pain, depression, and substance
abuse.  Tr. 330–31.  For example, while Dr. Belcher noted "depressed mood, psychomotor
retardation, loss of energy, [and] feelings of worthlessness" as symptoms of LaDuke's
depression, she did not frame these as functional limitations.  Tr. 331.  Dr. Boyd relied heavily
on Dr. Belcher's opinion and adopted her diagnoses, except nicotine dependence, as medically
determinable impairments.  *See* Tr. 357 (listing pain disorder, major depressive disorder, alcohol
dependence in remission).  From this, Dr. Boyd formulated a mental RFC that limited LaDuke to
simple task sequences of one to two steps.  Tr. 368.

The ALJ's omission of Dr. Belcher's diagnoses is harmless because there is no evidence
that Dr. Boyd's derivation of functional limitations from Dr. Belcher's examination was
incomplete.  In other words, regardless of LaDuke's particular mental impairments—be they
bipolar disorder, pain disorder, or major depressive disorder— the ALJ captured the limitations
in Dr. Belcher's opinion as elucidated by Dr. Boyd.  *See Valentine*, 574 F3d at 692 n2 (holding
the ALJ's omission of spine, knee, and shoulder injuries immaterial when the RFC included
"several physical limitations" and the claimant "does not detail what other physical limitations
follow from the evidence of his knee and should[er] injuries, besides the limitations already
listed in the RFC").

**B.**    **Mr. Roders**

Mr. Roders, a therapist intern, treated LaDuke weekly from March 31 through July 8,
2010.  Tr. 424–28; *see also* Tr. 401–07.  Mr. Roders filled out a form provided by LaDuke's

attorney in which he opined that LaDuke suffers multiple panic attacks per day, likely causing "excessive absenteeism." Tr. 24–25. He also filled out a mental RFC form, opining that LaDuke suffered from one moderate and four marked impairments in sustained concentration and persistence, three marked limitations in social interactions, and two marked limitations in adaptation. Tr. 428–30. Finally, Mr. Roders noted that LaDuke's "frequent anger and profanity would seem a significant barrier to working with others." Tr. 430.

The ALJ found that Mr. Roders was not an acceptable medical source. Tr. 20. Further, he gave Mr. Roders' opinion little weight because it was based on LaDuke's own reporting of symptoms and was contradicted by the opinions of other acceptable medical sources. *Id.* LaDuke concedes that Mr. Roders' opinion was partially based on LaDuke's self-reporting, but he argues that those portions of the opinion based on Mr. Roders' observations should be credited.

Although Mr. Roders had a treating relationship with LaDuke, he is an "other" medical source for purposes of the disability analysis. *See Molina*, 674 F3d at 1111, citing 20 CFR § 404.1513(d)(1). Thus, the ALJ was only required to offer a germane reason for disregarding Mr. Roders' opinion. *See id*, quoting *Turner*, 613 F3d at 1224. As the ALJ noted, the mental limitations described by Mr. Roders are much more severe than those found by the acceptable medical sources in the record. Tr. 20. For example, Dr. Boyd, a reviewing psychologist, found that LaDuke suffered only a single moderate limitation in his ability to remember and carry out detailed instructions. *Compare* Tr. 366–67 *with* Tr. 428–30.[5] Further, Dr. Boyd's opinion

---

[5] The Court notes that, commendably, Mr. Roders justifies most of the limitations he denoted in the form he submitted. However, some of the evidence relied on by Mr. Roders is consistent with the evidence presented to Dr. Belcher. *Compare e.g.*, Tr. 329 (noting his periods of "fighting and other risky behaviors" which stem from "substance abuse") *with* Tr. 429 (noting marked limitation due to "panic and anger in some social situations"). As

explicitly relied on Dr. Belcher's examination which found only "mild" deficits in attention, concentration, and memory. Tr. 357. Contradiction with the weight of the medical evidence is a germane reason to discount the opinion of a lay witness. *See Lewis v. Apfel*, 236 F3d 503, 511 (9th Cir 2001), citing *Vincent v. Heckler*, 739 F2d 1393, 1395 (9th Cir 1984) ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence."). Thus, the ALJ's rejection of Mr. Roders' opinion was proper.

In sum, the ALJ did not err in his consideration of the opinions of Dr. Belcher and Mr. Roders. Thus, the ALJ's treatment of the medical evidence is affirmed.

## IV.    Lay Witness Testimony

LaDuke also argues that the ALJ's rejection of the lay witness testimony from his wife, Jamaica LaDuke, was erroneous and not supported by substantial evidence. Friends and family members in a position to observe a claimant's symptoms and daily activities are competent to testify as to the claimant's condition. *See Dodrill*, 12 F3d at 918–19. Such testimony cannot be disregarded without providing a germane reason. *Id* at 919. Inconsistency with the medical record is a germane reason. *Bayliss*, 427 F3d at 1218.

As of the hearing date, Ms. LaDuke had been married to LaDuke for almost six years but known him for much longer. Tr. 65. Ms. LaDuke endorsed many of the activities of daily living that LaDuke described in his own testimony, stressing his need to take frequent breaks while doing chores or working. *See, e.g.*, Tr. 67–68 (describing LaDuke's need to take several breaks while at work); Tr. 181, 183, 186 (noting that LaDuke can walk ten to fifteen feet before needing

---

such, the ALJ cannot be faulted for accepting the interpretations offered by Drs. Belcher and Boyd over the interpretation offered by Mr. Roders when they are both based on similar reports from LaDuke. *See, e.g.*, *Smolen*, 80 F3d at 1285 ("[T]he opinions of a specialist about medical issues related to his or her area of specialization are given more weight than the opinions of a nonspecialist.").

to rest). She noted that he is generally able to care for himself, but she must help him out of the shower. Tr. 182. She reported that she accompanies LaDuke when he goes out, providing assistance if his anxiety or pain flares up; she also noted LaDuke's irritability and difficulty communicating. Tr. 69, 71, 184. Generally, she opined that LaDuke's depression, anxiety, and pain keep him from working. Tr. 69, 188.

The ALJ found Ms. LaDuke's testimony "generally consistent with the claimant's own report," but gave it only partial weight "to the extent it is consistent with medical and other evidence described above." Tr. 20. LaDuke argues that the ALJ erred by failing to indicate the portion of Ms. LaDuke's testimony to which he gave partial credit and for not providing any reason for partially rejecting her testimony.

Although the ALJ could have been more specific in identifying the conflict between Ms. LaDuke's testimony and the medical evidence, he was not required to "clearly link his determination to those reasons." *Lewis*, 236 F3d at 512. Indeed, the Ninth Circuit has held that when an "ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina*, 674 F3d at 1114, citing *Valentine*, 574 F3d at 694. The ALJ clearly relies on the contradictory medical evidence in the record and the reasons given for discounting LaDuke's testimony to support giving Ms. LaDuke's testimony partial weight.

LaDuke argues that the ALJ could not discount his wife's testimony for the same reasons given to discount his own testimony because his wife's testimony differed in two respects. He point to her description of limitations in his work activities and social functioning.

OPINION AND ORDER, Page 19

Although certain details in Ms. LaDuke's testimony differed from her husband's testimony, they both alleged that his ability to work more than part-time was encumbered by pain-induced fatigue. However, as discussed above, the ALJ properly rejected LaDuke's testimony regarding his limited ability to work at his part-time job, citing LaDuke's inconsistent activities of daily living. This reason applies equally to Ms. LaDuke's testimony. *See Molina*, 674 F3d at 1122 (affirming the ALJ's failure to discuss lay testimony when "the ALJ's reasons for rejecting [the claimant's] testimony apply with equal force to the lay testimony"). As such, the ALJ provided a germane reason to discount Ms. LaDuke's statements. *See Valentine*, 574 F3d at 694 ("In light of our conclusion that the ALJ provided clear and convincing reasons for rejecting Valentine's own subjective complaints, and because Ms. Valentine's testimony was similar to such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony.").

As to social functioning, Ms. LaDuke noted that, as a result of his chronic pain, LaDuke is irritable and his patience with tenants varies. Tr. 69, 71. Although the ALJ did not address this directly, he did note that LaDuke reported no trouble interacting with his supervisor. Tr. 16, citing Tr. 54. More significantly, LaDuke appears to successfully supervise two employees despite his alleged irritability. *See* Tr. 55, 68. As such, the ALJ did not err in rejecting Ms. LaDuke's testimony as to LaDuke's social functioning. *See Valentine,* 574 F3d at 693 (holding inconsistent testimony and activities undermined a claimant's description of a debilitating condition).

LaDuke also argues that Ms. LaDuke's report that her husband is disabled by depression and anxiety is not contradicted by the objective medical evidence. In a third-party assessment

OPINION AND ORDER, Page 20

form, Ms. LaDuke opined that LaDuke's depression and anxiety were barriers to his ability to work. Tr. 188. "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 CFR §§ 404.1529(c)(2), 416.929(c)(2). As discussed above, Dr. Belcher conducted a psychological examination of LaDuke on which Dr. Boyd relied in formulating a mental RFC. Even ignoring Dr. Boyd's opinion,[6] Dr. Belcher's opinion is, at most, consistent with Ms. LaDuke's testimony that LaDuke suffers from depression. Tr. 331 (noting LaDuke "suffers from moderate depression").

Dr. Belcher's observations during the mental status exam—LaDuke's poor eye contact, blunted affect, and a sarcastic laugh—do not necessarily equate to disabling depression and anxiety. Tr. 326. The only concrete limitation suggested by Dr. Belcher was a "mild impairment in attention, concentration, and memory." Tr. 327. Indeed, in commenting on LaDuke's depression, Dr. Belcher noted that it is "often being confused with anxiety." Tr. 331. Moreover, as discussed above, Dr. Belcher offered no concrete functional limitations resulting from LaDuke's moderate depression. As such, it was reasonable for the ALJ to rely on the objective medical evidence, including the results of Dr. Belcher's examination, to give less weight to Ms. LaDuke's testimony regarding the extent of LaDuke's mental impairments. *See Bayliss*, 427 F3d at 1218.

In sum, the ALJ advanced germane reasons to discredit the opinion of Ms. LaDuke, a lay witness. Thus, the ALJ's rejection of Ms. LaDuke's testimony is affirmed.

///

---

[6] The Court notes that although Dr. Boyd limited LaDuke to sequential tasks with one to two step instructions, Ms. LaDuke reported that LaDuke has no difficulty following written and oral instructions. *Compare* Tr. 186 *with* Tr. 368.

V.      **VE Testimony**

Finally, LaDuke argues that the VE's testimony does not satisfy the Commissioner's burden at step five.  At step five of the sequential process, the Commissioner has the burden to show that the claimant can perform other work existing in significant numbers in the national economy.  20 CFR §§ 404.1520(e)-(f), 416.920(e)-(f); *see also Yuckert*, 482 US at 141–42.  In meeting this burden, the ALJ may define the claimant's capacity for physical exertion.  *See* 20 CFR §§ 404.1567, 416.967.  If the ALJ, however, determines that the claimant's capacity for physical exertion falls between two defined categories, then it is appropriate for the ALJ to consult a VE.  *See Moore v. Apfel*, 216 F3d 864, 870–71 (9th Cir 2000), citing SSR 83-12, *available at* 1983 WL 31253.  An ALJ may pose a hypothetical to a VE, but the hypothetical must contain "all of the limitations that the ALJ found credible and supported by substantial evidence in the record."  *Bayliss*, 427 F3d at 1217.

LaDuke argues that the ALJ inappropriately omitted functional limitations found in his and his wife's testimony.  As discussed above, the ALJ properly rejected LaDuke's testimony and the lay witness testimony.  As a result, the ALJ was not required to incorporate those limitations in the hypothetical presented to the VE.  *See Batson*, 359 F3d at 1197–98.

LaDuke also argues that restriction in the RFC to work involving one to two step tasks does not incorporate the ALJ's previous finding of a moderate limitation in concentration, persistence, and pace.  The RFC limits LaDuke to tasks involving "simple instructions of 1 [to] 2 steps" which must "be broken down into task sequences."  Tr. 17.  This limitation was included in the hypothetical given to the VE at the hearing.  Tr. 78.

OPINION AND ORDER, Page 22

At step three, the ALJ found that LaDuke suffered from moderate difficulties with concentration, persistence, or pace.  Tr. 16.  The ALJ, however, expressly stated that "[t]he limitations identified [at step three] are not a [RFC] assessment but are used to rate the severity of mental impairments. . . . The mental [RFC] assessment used at steps 4 and 5 . . . requires a more detailed assessment."  Tr. 17.

A "moderate" restriction does not automatically correspond to any specific restriction in the RFC.  Instead, the ALJ's assessment must be "consistent with restrictions identified in the medical testimony."  *Stubbs-Danielson v. Astrue*, 539 F3d 1169, 1174 (9th Cir 2008) (citations omitted).  Thus, the appropriate inquiry is whether the mental limitations in the RFC adequately capture the "concrete restrictions" supported by substantial evidence in the record.  *Id.*  As discussed above, Dr. Belcher did not offer any concrete limitations in her opinion.  Thus, Dr. Boyd was the only acceptable medical source to offer any such limitations.  It was not error for the ALJ to adopt the only concrete limitations in the record.[7]  *Id* at 1175 ("[T]he only concrete limitations in this case were provided by Dr. Eather who, after considering Stubbs–Danielson's deficiencies in pace and other areas, found Stubbs–Danielson able to perform simple tasks.").

In sum, the hypothetical presented to the VE incorporated all limitations in the record supported by substantial evidence.  Thus, the ALJ's finding at step five is affirmed.

 ///

 ///

 ///

---

[7] Although Mr. Roders offered several limitations, as discussed above, the ALJ properly rejected his opinion.

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's decision is based on proper legal

standards and supported by substantial evidence.  Therefore, it must be AFFIRMED.

DATED this 15th day of March, 2013.

<div style="margin-left: 50%;">

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

</div>

OPINION AND ORDER, Page 24